ROBERT C. SCHUBERT (rschubert@sjk.law) (SBN 62684)
AMBER L. SCHUBERT (aschubert@sjk.law) (SBN 278696)
SONUM DIXIT (sdixit@sjk.law) (SBN 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
***Western Division***

| | |
|---|---|
| Austin Lance, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>Irradiance Medical Group, Inc., and DermCare Management, LLC,<br><br>*Defendants*. | No. 2:26-cv-4908<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Austin Lance ("Plaintiff"), on behalf of himself and on behalf of all others similarly situated alleges the following against Defendants Irradiance Medical Group, Inc. ("Irradiance") and DermCare Management, LLC ("DermCare") (together, "Defendants") upon personal knowledge as to his own acts, and based upon his investigation, his counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendants (the "Data Breach"), which held in their possession certain personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiff and other current and former patients of Defendants.

2. Defendant Irradiance is a Los Angeles-based dermatology provider that operates two locations. In the course of providing its healthcare services, Defendant Irradiance received PII and PHI from hundreds or thousands of individuals.

3. Defendant DermCare is a dermatology practice management company that provides physician support services, clinical operations support, marketing and practice development, and multi-year retirement planning to providers in 60 locations in Texas, Florida, California, and Virginia. In the course of providing these services to dermatology providers, Defendant DermCare received PII and PHI from at least thousands of individuals.

4. Defendant DermCare provides its services to Defendant Irradiance.

5. In turn, Defendants came into the possession of, and maintain extensive files containing, the PII and PHI of thousands of patients, and owe these individuals an affirmative duty to adequately protect and safeguard this Private Information against theft and misuse. Despite such duties created by statute, regulation, and common law, at all relevant times, Defendants utilized deficient data security

practices, thereby allowing thousands of persons' sensitive and private data to fall into the hands of strangers.

6. On February 26, 2025, DermCare detected "suspicious activity" in its computer systems.[1]

7. DermCare later learned that "certain files were accessed or taken without authorization between February 14, 2025, and February 26, 2025."[2] Thus, cybercriminals had unfettered access to Plaintiff's and the Class's highly private information for twelve days.

8. According to Defendants' Data Breach Notice, Defendant DermCare began notifying individuals, including Plaintiff, of the breach on April 8, 2026.

9. But for Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' PII and PHI, the Data Breach would not have occurred.

10. Defendants are well-aware that they are at high risk of attempted cyberattack due to the high value of the sensitive data.

11. Despite Defendants' awareness of both the value and sensitivity of the data they safeguarded and serious risk presented by insufficient security practices, Defendants did not take sufficient steps to ensure that their systems were secure. Defendants knew or should have known about the risk to the data they stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

12. The Data Breach was directly and proximately caused by Defendants' failure to implement reasonable and industry-standard data security practices necessary to protect their systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the sensitive PII and PHI of at least thousands of

---

[1] *See* Exhibit A.

[2] *Id.*

individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

13. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security. Likewise, the exfiltration of PHI puts Plaintiff and the Class Members at a present and continuing risk of medical identity theft, which poses an even more critical threat to victims because such fraud could lead to loss of access to necessary healthcare through misuse of paid-for insurance benefits or by incurring substantial medical debt.

14. Moreover, Defendants' failure to notify Plaintiff and Class Members that they had been impacted by this data breach for at least over a year after Defendants became aware of the breach harmed Plaintiff and made it more difficult for Plaintiff to take swift action to respond to the breach.

15. Plaintiff and Class Members have been harmed because they are at immediate risk of having their Private Information used against them. Indeed, they have been at risk well before Defendants even notified Plaintiff of the breach.

Plaintiff does not know if his data has been sold, transferred, replicated, or irrevocably disseminated and exposed. He suffered harm in the loss of the value of his data which cannot be easily recovered, if ever.

16. Plaintiff, individually and on behalf of a nationwide class, alleges claims of negligence, breach of implied contract; unjust enrichment, invasion of privacy under Article I, Section 1 of the California Constitution, violation of California's Unfair Competition Law, the California Customer Records Act, California Consumer Privacy Act of 2018, and California's Confidentiality of Medical Information Act. Plaintiff also seeks declaratory and injunctive relief. Plaintiff asks the Court to compel Defendants to adopt reasonable information security practices to secure the sensitive PII and PHI that Defendants collect and store in their databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiff***

17. Plaintiff Austin Lance is and at all times mentioned herein was an individual citizen of the State of California, residing in the city of Los Angeles. He brings this case on behalf of himself and all others similarly situated.

***Defendants***

18. Defendant Irradiance Medical Group, Inc. is a California corporation with its headquarters and principal place of business located at 420 East Third Street, Suite 805, Los Angeles, CA 90013.

19. Defendant Irradiance's registered agent is C T Corporation System, located at 330 North Brand Boulevard, Suite 700, Glendale, California 91203.

20. Defendant DermCare Management, LLC is a Florida limited liability corporation with its headquarters and principal place of business located at 4000 Hollywood Blvd., Suite 215-S, Hollywood, Florida 33021.

21. Defendant DermCare's registered agent in California is C T Corporation System, located at 330 North Brand Boulevard, Suite 700, Glendale, California 91203.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

23. This Court has general personal jurisdiction over Defendant Irradiance through its business operations in this District, the specific nature of which occurs in this District. Defendant Irradiance's principal place of business is in this District. Defendant Irradiance intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

24. This Court has specific personal jurisdiction over Defendant DermCare because it has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. DermCare provides its services to dermatology providers in California, including Defendant Irradiance, and does so on a continuous and systematic basis. The claims alleged herein arise out of each Defendant DermCare's provision of services to dermatology providers in California. Plaintiff's claims arise substantially from events, acts, or omissions that took place in California.

25. The California long-arm statute enables jurisdiction over this matter under the California Code of Civil Procedure § 410.10, which states that a court may assert jurisdiction over a nonresident defendant where the defendant has sufficient "minimum contacts" with the forum such that maintenance of the action does not offend traditional notions of fair play and substantial justice. Defendant DermCare's

provision of services to dermatology providers in California provides sufficient "minimum contacts" with the forum state to permit jurisdiction.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District. Defendant Irradiance is also based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members from and/or in this District.

## FACTUAL ALLEGATIONS

### I. Background

27. Defendant Irradiance provides "personalized, comprehensive care for all types of skin conditions" and operates two Los Angeles-based locations in Little Tokyo and Torrance.[3]

28. Defendant Irradiance provides diagnostic and treatment services such as biopsies, skin cancer removal surgeries, laser treatments, chemical peels, and facial treatments.[4] Defendant Irradiance also provides care to patients with psoriasis, eczema, acne, and pigmented lesions.[5]

29. In the ordinary course of receiving services from Defendant Irradiance, Plaintiff and Class Members were required to provide their Private Information to Defendant Irradiance.

30. Founded in 2016,[6] DermCare "is a full-service practice management company partnering with providers who specialize in dermatology and aesthetic medicine."[7]

---

[3] *About Irradiance Medical Group Dermatology*, IRRADIANCE DERMATOLOGY, https://www.doctor-ho.com/about (last visited May 6, 2026).

[4] *Id.*

[5] *Id.*

[6] *About Our Team*, DERMCARE MGMT., https://www.dermcaremgt.com/dermcare-management/ (last visited May 5, 2026).

[7] *What We Do*, DERMCARE MGMT., https://www.dermcaremgt.com/what-we-do/ (last visited May 5, 2026); *What We Do*, DERMCARE MGMT.,

31. DermCare provides career support services, operational support services in compliance, finance, purchasing, marketing, and payroll, administrative services support, and financial management and RCM support.[8]

32. DermCare partners with over 140 providers in over 70 locations, and serves over 600,000 patients in Florida, Texas, Virginia, North Carolina and California.[9]

33. As a condition of providing these services, DermCare requires that its client providers, such as Defendant Irradiance, entrust it with highly sensitive personal information belonging to their patients. In the ordinary course of receiving services from DermCare's provider clients, Plaintiff and Class Members were required to provide their Private Information to Defendant DermCare.

34. Defendant Irradiance's Privacy Policy states that it "secures the personally identifiable information you provide on computer servers in a controlled, secure environment, protected from unauthorized access, use or disclosure[]" and that it protects personal information "through the use of encryption, such as the Secure Socket Layer (SSL) protocol."[10]

35. Defendant DermCare's Privacy Policy states that "DermCare Management is dedicated to maintaining the privacy of your Individually Identifiable Health Information (IIHI). . . . We are required by law to maintain the confidentiality of health information that identifies you and to provide you with this

---

https://www.dermcaremgt.com/what-we-do/operations-office-support/ (last visited May 5, 2026).

[8] *Id.*

[9] *Id. See also* DERMCARE MGMT., *supra* note 7.

[10] *Privacy Policy*, IRRADIANCE DERMATOLOGY, https://www.doctor-ho.com/your-privacy (last visited May 6, 2026).

notice of our legal duties."[11] DermCare also claims to have a Data Protection Officer.[12]

**II. The Breach**

36. Defendant DermCare learned of unauthorized access to its computer systems on February 26, 2025, with such unauthorized access having taken place between February 14, 2025, and February 26, 2025.[13]

37. Through the Data Breach, the cybercriminal gained unauthorized access to highly sensitive Private Information, including names, dates of birth, medical record numbers, diagnosis, treatment locations, procedure types, treatment cost information, doctors' names, health insurance information, and patient identification numbers.[14]

38. According to *The HIPAA Journal*, the cybercriminal also gained unauthorized access to Social Security numbers, driver's license numbers, credit and debit card information, financial account information.[15]

39. On or around April 8, 2026, over a year after DermCare learned that the information was accessed by cybercriminals, DermCare began to notify Plaintiff and other Class Members that their Private Information was viewed and taken by cybercriminals.

40. The Data Breach Notices do not provide details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur

---

[11] *Privacy Policy*, DERMCARE MGMT., https://www.dermcaremgt.com/privacy-policy/ (last visited May 5, 2026).

[12] *Id.*

[13] *See* Exhibit A.

[14] *Id*

[15] Steve Alder, *Data Breaches Announced by DermCare Management; Option Care Health; Aetna*, THE HIPAA J. (Apr. 13, 2026), https://www.hipaajournal.com/data-breaches-dermcare-management-option-care-health-aetna/ (last visited May 6, 2026).

again. To date, Defendants have not explained or clarified these facts with Plaintiff and Class Members.

41. Without these details, Plaintiff's and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

42. Defendant DermCare's Data Breach notice offers no substantive steps to help victims like Plaintiff and Class Members to protect themselves other than offering select individuals (not including Plaintiff)[16] a limited free subscription to Epiq's free credit monitoring and identity protection services, which is woefully inadequate considering the lifelong increased risk of fraud and identity theft that Plaintiff and Class Members now face as a result of the Data Breach.

## III. The Healthcare Sector Is Increasingly Susceptible to Data Breaches, Giving Defendants Ample Notice That They Were a Likely Cyberattack Targets

43. At all relevant times, Defendants knew, or should have known, that the PII and PHI they were entrusted with was a target for malicious actors. Defendants knew this given the unique type and the significant volume of data on their networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the unencrypted data would harm.

44. As custodians of Plaintiff's and Class Members' PII and PHI, Defendants knew or should have known the importance of protecting their PII and PHI, and of the foreseeable consequences and harms to such persons if any data breach occurred.

45. Defendants were on notice that the FBI has been long concerned about data security in the healthcare industry. In August 2014, after a cyberattack on

[16] *Compare https://oag.ca.gov/system/files/Dermcare%20Topco%20LLC%20-%20Notice%20of%20Data%20Event%20-%20CA_0.pdf with* Exhibit A.

Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[17]

46. In January 2023, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendants of the severe threats posed by cybercriminal groups.[18]

47. Defendants' security obligations were especially important due to the substantial increase of cyberattacks and data breaches in recent years, particularly those targeting healthcare businesses and other organizations like Defendants, which store and maintain large volumes of PII and PHI. These largescale cyberattacks are increasingly common and well-publicized. Through the end of November 2023, 640 largescale cyberattacks had targeted hospitals, health systems, and healthcare records in 2023, affecting more than 115 million people—making 2023 the "worst-ever year for breached healthcare records."[19]

48. Patient records, such as those stolen from Defendants, are "often processed and packaged with other illegally obtained data to create full record sets

---

[17] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[18] *See* Royal & BlackCat Ransomware: The Threat to the Health Sector, *available at* https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last visited June 24, 2025).

[19] November 2023 Healthcare Data Breach Report, THE HIPAA JOURNAL (Dec. 21, 2023), https://www.hipaajournal.com/november-2023-healthcare-data-breach-report/.

(fullz) that contain extensive information on individuals, often in intimate detail."[20] The record sets are then sold on Dark Web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[21]

49. With the surging number of such attacks targeting companies in the healthcare sector, Defendants knew or should have known that they were at high risk of cyberattack and should have taken additional and stronger precautions and preemptive measures.

**IV. Defendants Failed to Comply with FTC Guidelines**

50. At all times relevant to this Complaint, Defendants knew or should have known the significance and necessity of safeguarding patients' PII and PHI, and the foreseeable consequences of a data breach. Defendants knew or should have known that because they collected and maintained the PII and PHI for a significant number of patients, a significant number of patients would be harmed by a breach of their systems. Defendants further knew due to the nature of their business practices in the healthcare sector that they were entrusted with was highly valuable and contained private and sensitive information including medical information.

51. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

52. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices

---

[20] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA J. (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records/.

[21] *Id.*

that businesses should implement to protect PII.[22] The guidelines highlight that businesses should (a) protect the personal customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

53. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

54. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

55. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

56. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

57. Defendants knew or should have known of their obligation to implement appropriate measures to protect their patients' PII but failed to comply with the FTC's basic guidelines.

58. Defendants' failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as

[22] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last visited March 21, 2024)

prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

59. Once Defendants became aware of the breach, they could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including taking *any* steps whatsoever to attempt to mitigate the harm caused by the breach.

60. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves will also re-use stolen PII and PHI, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII and PHI.

61. Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[23] Plaintiff and Class Members generally have spent considerable time and stress in attempting to mitigate the present and future harms caused by the breach. The U.S. Department of Justice's Bureau of Justice Statistics has reported that, even

---

23 https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf. (last visited September 6, 2024)

if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[24]

62. The information compromised in the Data Breach—including detailed medical information—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts Plaintiffs and Class Members at additional risk for potential medical fraud and medical identity theft.

63. Data breaches and disclosures involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[25] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[26] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

**V. Defendants Failed to Comply with Industry Standards**

64. Security standards for businesses storing PII and PHI commonly include, but are not limited to:

a) Maintaining a secure firewall

b) Monitoring for suspicious or unusual traffic on the website

---

[24] https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last visited September 6, 2024)

[25] *See What to Know About Medical Identity Theft*, FEDERAL TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 22, 2023).

[26] *Id.*

c) Looking for trends in user activity including for unknown or suspicious users

d) Looking at server requests for PII

e) Looking for server requests from VPNs and Tor exit nodes

f) Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII

g) Structuring a system including design and control to limit user access as necessary, including a user's access to the account data and PII of other users.

65. Other best practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

66. Defendants failed to meet minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR- DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM- 06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIC CSC), which are all established standards in reasonable cybersecurity readiness.

67. These frameworks are existing and applicable healthcare industry standards which Defendants failed to comply with.

**VI. Defendants Failed to Comply with HIPAA Guidelines**

68. HIPAA requires business associates such as Defendant DermCare and covered entities such as Defendant Irradiance to protect against reasonably foreseeable threats to the security of sensitive patient health information.

69. Business associates and covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

70. Title II of HIPAA contains the Administrative Simplification provisions, which require that the Department of Health and Human Services ("HHS") create rules to streamline standards for handling PII like the data that was not adequately safeguarded by Defendants.

71. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI is properly maintained.[27]

72. The Data Breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' safety failures include, but are not limited to:

a. Failing to ensure the confidentiality and integrity of electronic PHI that they create, receive, maintain, and transmit in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably anticipated threats or hazards to the security and integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

---

[27] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

f. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1).

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents known to the covered entity in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

h. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

## VII. Plaintiff's and Class Members' Experiences

73. Plaintiff Austin Lance provided his sensitive PII and PHI to Defendant Irradiance to receive its dermatology services.

74. Upon information and belief, Defendant DermCare obtained Plaintiff Lance's Private Information from Defendant Irradiance.

75. Plaintiff received notice of the Data Breach around April 8, 2026, informing him that his sensitive information was part of Defendants' Data Breach.

76. Plaintiff provided Defendants with his most sensitive medical and personal information and cannot be sure how much of it was exfiltrated.

77. Plaintiff suffered an actual injury in the form of damages and diminution in the value of his Private Information—a form of tangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

78. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

79. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

**VIII. Defendants Breached Their Obligations to Plaintiff and the Class**

80. Defendants fail to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and they entirely fail to provide any compensation for their unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out-of-pocket costs, and the time taken by Plaintiff and Class Members mitigate their injuries.

81. Plaintiff and Class Members have been damaged by the compromise and exfiltration by cybercriminals of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of the Data Breach.

82. Plaintiff and Class Members were damaged since their Private Information is being sold or potentially for sale by cybercriminals in the years to come.

83. As a direct and proximate consequence of Defendants' conduct, Plaintiff and Class Members have been placed at an imminent, actual, and substantial risk of harm from fraud and identity theft, especially considering the actual fraudulent misuse of the Private Information that has already taken place.

84. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

85. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Plaintiff and Class Members face substantial

risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

86. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

87. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cybercriminals in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

88. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity.[28] The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to

[28] Medical Identity Theft: FAQs for Health Care Providers and Health Plans, FED. TRADE COMM'N, *available at* https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last visited Jan. 8, 2024).

victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[29]

89. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

90. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;
b. Cancelling and reissuing credit and debit cards;
c. Purchasing credit monitoring and identity theft prevention;
d. Monitoring their medical records for fraudulent charges and data;
e. Addressing their inability to withdraw funds linked to compromised accounts;
f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;
g. Placing "freezes" and "alerts" with credit reporting agencies;
h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;
i. Contacting financial institutions and closing or modifying financial accounts;
j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

---

[29] Justin Klawans, *What is medical identity theft and how can you avoid it?*, THE WEEK (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid.

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

91. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password protected.

92. Defendants' delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a Data Breach victim mitigate their injuries, and conversely, delayed notification causes more harm and increases the risk of identity theft. Here, Defendants knew of the breach since March 2025, and did not notify all victims until April 8, 2026. Yet Defendants offered no explanation or purpose of the delay. This delay violates HIPAA and other notification requirements and increased injuries to Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

93. Pursuant to Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), Plaintiff brings this action on behalf of himself and those similarly situated, on behalf of the following Nationwide Class and California Subclass (together, the "Class"):

> **Nationwide Class: All persons in the United States who were impacted by Defendant' Data Breach, including all those who received notice of the breach.**

**California Subclass: All persons in the State of California who were impacted by Defendants' Data Breach, including all those who received notice of the breach.**

94. Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

95. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements therein.

96. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Upon information and belief, the Class is comprised of at least thousands of individuals.

97. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a) Whether Defendants failed to take adequate and reasonable measures to ensure their websites and data systems were protected;

b) Whether Defendants failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

c) Whether Defendants unreasonably delayed in notifying patients of the harm they suffered once the suspicious activity was detected;

d) Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their PII and PHI;

e) Whether Defendants breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII and PHI;

f) Whether Defendants' conduct violated Plaintiff's and Class Members' privacy;

g) Whether Defendants' conduct violated the statutes as set forth herein;

h) Whether Defendants took sufficient steps to secure Class Members' Private Information;

i) Whether Defendants were unjustly enriched;

j) Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

k) Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

98. **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

99. **Adequacy of Representation.** Plaintiff is an adequate class representative because he is a Class Member, and his interests do not conflict with the Class's interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the Class's benefit and will fairly and adequately protect their interests.

100. **Predominance and Superiority.** The Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court system could not.

It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

101. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiff and the Class

102. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

103. Plaintiff was required to provide PII and PHI as a precondition for receiving healthcare services from Defendants. Plaintiff and Class Members

entrusted their PII and PHI to Defendants with the understanding that it would safeguard their PII and PHI.

104. Defendants had full knowledge of the sensitivity of the PII and PHI that they stored and the types of harm that Plaintiff and Class Members could and would suffer if that PII and PHI were wrongfully disclosed.

105. Defendants violated their duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendants' and Defendants' contractors' information security controls sufficiently rigorously to ensure that PII and PHI in their possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify patients of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

106. Defendants' duty of care arose from, among other things,

a) The special relationship between Defendants and patients resulting from Plaintiff and Class Members entrusting Defendants with confidential PII/PHI;

b) Defendants' exclusive ability (and Class Members' inability) to ensure that their systems, websites, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c) HIPAA, which requires Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. 164.530(c)(1).

d) Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

e) Defendants' common law duties to adopt reasonable data security measures to protect patient PII and PHI and to act under the same or similar circumstances as a reasonable and prudent person would act.

107. Plaintiff and Class Members were the foreseeable victims of Defendants' inadequate data security. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches. Defendants knew that a breach of their systems could and would cause harm to Plaintiff and Class Members.

108. Defendants' conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' conduct included their failure to adequately mitigate harm through negligently failing to inform victims of the breach of the specific information breached for (as of time of writing) more than a year after the purported first discovery of the breach.

109. Defendants knew or should have known of the inherent risks in collecting and storing massive amounts of PII and PHI and the importance of limiting disclosure of that PII and PHI.

110. Defendants' violation of the FTC Act and HIPAA constitutes negligence per se for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belong and to prevent the types of harm that resulted from the Data Breach.

111. Defendants, through their actions and inactions, breached their duty owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII and PHI while it was in their possession and control.

Defendants breached their duty by, among other things, their failure to adopt reasonable data security practices and their failure to adopt reasonable security and notification practices, failure to monitor the security of their networks and systems, and allowing unauthorized access to Plaintiff's and Class Members' Private Information.

112. Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and Class Members' injuries-in-fact.

113. Defendants inadequately safeguarded patients' PII and PHI in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

114. But for Defendants' breach of their duty to adequately protect Class Members' PII and PHI, Class Members' PII and PHI would not have been stolen.

115. There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiff and Class Members.

116. As a result of Defendants' failure to timely notify Plaintiff and Class Members that their Private Information had been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

117. As a direct and traceable result of Defendants' negligence, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary damages, increased risk of future harm, loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the

impact of the personal information compromised as a result of the Data Breach, overpayment for the services and products that were received without adequate data security; and embarrassment, humiliation, and emotional distress.

118. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

119. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 2**
**Breach of Implied Contract**
**On behalf of Plaintiff and the Class**

120. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

121. Plaintiff and Class Members entered into an implied contract with providers such as Defendant Irradiance when they paid money to, and entrusted these providers with their PII and PHI as a precondition for receiving skincare services.

122. Plaintiff and Class Members are third-party beneficiaries of contracts entered into by Defendant DermCare and healthcare providers such as Defendant Irradiance. It is because of the contracts between Defendants that Defendant DermCare came to possess the Private Information of Plaintiff and the Class Members.

123. Pursuant to these contracts, Defendant Irradiance paid money to Defendant DermCare and provided Defendant DermCare with Plaintiff's Private Information. In exchange, Defendant DermCare agreed to: (1) provide skincare-related services to Plaintiff and Class Members, (2) use Plaintiff's and Class

Members' Private Information to facilitate providing skincare-related services involving Plaintiff and Class Members, (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' Private Information; and (4) protect Plaintiff's and Class Members' Private Information in compliance with federal and state laws and regulations, industry standards, and its representations regarding its security and privacy practices.

124. As part of these transactions, Defendants agreed to safeguard and protect the PII and PHI of Plaintiff and Class Members and to timely and accurately notify them if their PII or PHI was breached or compromised.

125. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendants' data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendants' own representations. Plaintiff and Class Members believed that Defendants would use part of the monies paid to Defendants under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

126. Implicit in the agreement between Defendants, Plaintiff, and Class Members was the obligation that all parties would maintain information confidentially and securely.

127. These exchanges constituted an agreement and meeting of the minds between the parties.

128. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class Members would not have provided and entrusted their PII and PHI to Defendants in the absence of the implied contract or implied terms between them and Defendants. The safeguarding of the PII and PHI of Plaintiff and Class Members was critical to realize the intent of the parties.

129. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

130. Defendants breached their implied contracts with Plaintiff and Class Members to protect their PII and PHI when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with the legal obligations necessarily incorporated into these agreements; and; (4) failed to notify Plaintiff and Class Members of the specific data breached in a reasonably timely manner.

131. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII and PHI; illegal sale of the compromised PII and PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

132. As a direct and proximate result of the breach/unauthorized disclosure, Plaintiff and Class Members are entitled to relief as set forth herein.

133. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 3**
**Unjust Enrichment**
**On behalf of Plaintiff and the Class**

134. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

135. This count is brought in the alternative to Plaintiff's breach of contract claim.

136. Plaintiff and Class Members conferred a benefit on Defendant Irradiance by providing it their Private Information.

137. Plaintiff and Class Members conferred a benefit on Defendant DermCare by permitting their skincare providers such as Defendant Irradiance to turn over their Private Information to Defendant DermCare. Moreover, upon information and belief, Plaintiff alleges that payments he made to Defendant Irradiance and payments made by Defendant DermCare's clients (such as Defendant Irradiance) to Defendant DermCare included payment for cybersecurity protection, and that those cybersecurity costs were passed on to Plaintiff and Class Members in the form of elevated prices charged by DermCare and Irradiance for their services. Plaintiff and Class Members did not receive such cybersecurity protection. Specifically, they paid Defendants for healthcare services and provided Defendants with their PII and PHI. In exchange, Defendants should have provided adequate data security for Plaintiff and Class Members.

138. Upon information and belief, Defendant DermCare funds its data security measures and website from its general revenue, including payments made by its clients on behalf of Plaintiff and Class Members.

139. As such, a portion of the payments made for the benefit of or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data

security including the protection of the data from inadvertent disclosure to third parties. Defendants' website and their security and privacy measures are entirely under the sole control of Defendants.

140. Defendants, however, failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

141. Defendants would not be able to carry out an essential function of their regular business without the money and Private Information provided to them. Plaintiff and Class Members expected that Defendants or anyone in Defendants' position would use a portion of that revenue to fund adequate data security practices.

142. Defendants acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

143. Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments they received for adequate data security measures that would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

144. If Plaintiff and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have provided their Private Information to Defendants.

145. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and cheaper contractors and diverting those funds to their own profits. Plaintiff and Class Members, on the other hand, suffered

as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their Private Information.

146. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money wrongfully obtained from Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

147. Plaintiff and Class Members have no adequate remedy at law.

148. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injuries that include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII and PHI; illegal sale of the compromised PII and PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendants' Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

149. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

150. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 4**
**Injunctive/Declaratory Relief**
**On behalf of Plaintiff and the Class**

151. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

152. Defendants owe a duty of care to Plaintiff and Class Members, which required Defendants to adequately monitor and safeguard Plaintiff's and Class Members' PII and PHI.

153. Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII and PHI belonging to Plaintiff and Class Members.

154. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff and Class Members' PII and PHI and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and PHI and the risk remains that further compromises of their Private Information will occur in the future.

155. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to adequately secure the PII and PHI of Plaintiff and the Class within their care, custody, and control under the common law, HIPAA, and Section 5 of FTC Act;

b. Defendants breached their duty to Plaintiff and the Class by allowing the Data Breach to occur;

c. Defendants' existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII and PHI of Plaintiffs and the Class within Defendants' custody, care, and control; and

d. Defendants' ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

156. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with healthcare industry standards to protect the PII and PHI of Plaintiff and the Class within their custody, care, and control, including the following:

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiff and Class Members; and

b. Order that, to comply with Defendants' obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems,

networks, and servers on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. Encrypting and anonymizing the existing PII and PHI within their servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendants to provide adequate skincare services to their patients;

iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

iv. Auditing, testing, and training their security personnel regarding any new or modified procedures;

v. Segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems, networks, and servers;

vi. Conducting regular database scanning and security checks; and

vii. Routinely and continually conducting internal training and education to inform Defendants' internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

157. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not

have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

158. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

159. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII and PHI would be further compromised.

**Count 5**
**Violation of the Unfair Competition Law**
**Bus. & Prof. Code § 17200 *et seq.* ("UCL")**
**On Behalf of Plaintiff and the California Subclass**

160. Plaintiff, individually and on behalf of the class, incorporates the above allegations as if fully set forth herein.

161. Plaintiff pleads this claim for equitable relief, including restitution and injunctive relief, in the alternative to their claims for damages.

162. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

163. Defendants' actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* because Defendants' actions: (a) constituted negligence; (b) violated

federal law and regulations, including the FTC Act and HIPAA; and (c) violated the California Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*, the California Consumer Privacy Act of 2018 ("CCPA"), Cal. Civ. Code § 1798.100 *et seq.*, and California's Confidentiality of Medical Information Act ("CMIA"), Cal. Civ. Code §§ 56 *et seq.*

164. Defendants' actions as alleged in this Class Action Complaint also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious. The harm caused by Defendants' wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the Class, including Plaintiffs. There were ample reasonably available alternatives that would have furthered Defendants' legitimate business practices, including using industry-standard technologies to protect data (e.g., two-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for Defendants' services). Defendants also unreasonably delayed in notifying Plaintiff and Class Members regarding the unauthorized release and disclosure of their Private Information.

165. Defendants' conduct also is deceptive in violation of the UCL. Defendants' fraudulent business acts and practices include:

a. Failing to adequately secure the personal information of Plaintiff and Class Members from disclosure to unauthorized third parties or for improper purposes;

b. Enabling the disclosure of personal and sensitive facts about Plaintiff and Class Members in a manner highly offensive to a reasonable person;

c. Enabling the disclosure of personal and sensitive facts about Plaintiff and Class Members without their informed, voluntary, affirmative, and clear consent;

d. Omitting, suppressing, and concealing the material fact that Defendants did not reasonably or adequately secure Plaintiff's and Class Members' personal information.

166. Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of Plaintiffs' and Class Members' Private Information.

167. The harm from Defendants' conduct was not reasonably avoidable by consumers. Plaintiffs and Class Members were required to provide their Private Information to receive healthcare services from Defendants, and had no reasonable means of discovering that their information would be exposed to hackers through inadequate data security measures.

168. There were reasonably available alternatives that would have furthered Defendants' business interests of electronically transferring patients' information while protecting Private Information.

169. A reasonable person would regard Defendants' derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

170. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent conduct, Plaintiff lost money or property because his sensitive personal information experienced a diminution of value and because he devoted additional time to monitoring his financial accounts for fraudulent activity. Plaintiff faces ongoing and impending damages related to theft of his Private Information.

171. Defendants' wrongful practices constitute a continuing course of unfair competition because, on information and belief, Defendants have failed to remedy the lax security practices or even fully notify all affected California persons. Plaintiff

and the Class seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendants' wrongful practices and require Defendants to maintain adequate and reasonable security measures to protect the Private Information of Plaintiff and the Class.

172. Plaintiff and Class Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud.

173. Further, if an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Defendants have still not provided adequate information on the cause and scope of the Data Breach. Plaintiff and Class Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

174. Plaintiff and the Class also seek an order requiring Defendants to make full restitution of all monies they received through their wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

**Count 6**
**Invasion of Privacy Under California's Constitution (Article 1, § 1)**
**On Behalf of Plaintiff and the California Subclass**

175. Plaintiff, individually and on behalf of the California Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

176. Plaintiff and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their Private Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to obtain healthcare services from Defendants without the risk of their data being exfiltrated.

177. Plaintiff and California Subclass Members had a reasonable expectation that their communications, identity, and other data would remain confidential, and Defendants would keep their platforms secure.

178. By failing to secure Plaintiff's and California Subclass Members' personal data, Defendants intentionally invaded Plaintiff's and California Subclass Members' right to privacy under the California Constitution.

179. This invasion of privacy is serious in nature, scope, and impact because it relates to consumers' Private Information. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

180. As a result of Defendants' actions, Plaintiff and California Subclass Members have suffered harm and injury, including but not limited to invasion of their privacy rights.

181. Plaintiff and California Subclass Members have been damaged as a direct and proximate result of Defendants' invasion of privacy and are entitled to just compensation, including monetary damages.

182. Plaintiff and California Subclass Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

183. Plaintiff and California Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and California Subclass Members in conscious disregard of their rights.

184. Such damages are needed to deter Defendants from engaging in such conduct in the future.

185. Plaintiff also seeks other such relief as the Court may deem just and proper.

**Count 7**
**Violation of the California Customer Records Act ("CCRA")**
**Cal. Civ. Code §§ 1798.80 *et seq.***
**On Behalf of Plaintiff and the California Subclass**

186. Plaintiff, individually and on behalf of the California Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

187. "[T]o ensure that personal information about California residents is protected," the California legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

188. Defendants are businesses that own, maintain, or license personal information, within the meaning of Cal. Civ. Code § 1798.81.5, about Plaintiff and California Subclass Members.

189. Defendants violated Cal. Civ. Code § 1798.81.5 by failing to implement reasonable measures to protect California Subclass Members' Private Information.

190. Businesses that own or license computerized data that includes personal information are required to notify California residents when their Private Information has been acquired (or has reasonably believed to have been acquired) by unauthorized persons in a data security breach "in the most expedient time possible and without unreasonable delay." Cal. Civ. Code § 1798.82. Among other requirements, the security breach notification must include "the types of personal information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

191. Defendants are businesses that own or license computerized data that includes personal information as defined by Cal. Civ. Code § 1798.82.

192. Plaintiff's and California Subclass Members' Private Information includes personal information identified in Cal. Civ. Code § 1798.82(h) such as health insurance information and medical information (in the form of medical record numbers, diagnoses, treatment locations, procedure types, treatment cost information, doctor's names, and patient identification numbers), and is thereby covered by Cal. Civ. Code § 1798.82.

193. Plaintiff and the California Subclass Members are "customers" within the meaning of Cal. Civ. Code § 1798.80(c), as their personal information was provided to Defendants in the process of receiving skincare services from Defendants.

194. The Data Breach constituted a breach of Defendants' security systems, networks, and servers.

195. Because Defendants reasonably believed that Plaintiff's and California Subclass Members' Private Information was acquired by unauthorized persons during the Data Breach, Defendants had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Cal. Civ. Code § 1798.82.

196. Defendants unreasonably delayed informing Plaintiff and the California Subclass Members about the breach of security of their Private Information after they knew the breach had occurred.

197. Upon information and belief, no law enforcement agency instructed Defendants that notification to California Subclass Members would impede an investigation.

198. Thus, by failing to disclose the Data Breach in a timely and accurate manner, Defendants also violated Cal. Civ. Code § 1798.82.

199. Pursuant to Cal. Civ. Code § 1798.84, "[a]ny waiver of a provision of this title is contrary to public policy and is void and unenforceable," "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," and "[a]ny business that violates, proposed to violate, or has violated this title may be enjoined."

200. As a direct and proximate result of Defendants' violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiff and California Subclass Members were (and continue to be) injured and suffered (and will continue to suffer) damages, as described above.

201. Plaintiff and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including, but not limited to, actual damages, any applicable statutory damages, and equitable and injunctive relief.

**Count 8**
**Violation of the California Consumer Privacy Act of 2018 ("CCPA")**
**Civ. Code § 1798.100 *et seq.***
**On Behalf of Plaintiff and the California Subclass**

202. Plaintiff, individually and on behalf of the California Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

203. Section 1798.150(a)(1) of the CCPA provides, "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined by [Civil Code section 1798.81.5(d)(1)(A)] . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

204. Plaintiff is a consumer and California resident as defined by Civil Code section 1798.140(i).

205. Defendants are businesses as defined by Civil Code section 1798.140(d)(2) because they are "organized or operated for the profit or financial benefit of [their] shareholders or other owners," and "collect[] consumers' personal information, or on the behalf of which such information is collected and that alone, or jointly with others, determine[] the purposes and means of the processing of consumers' personal information, that does business in the state of California."

206. Plaintiff's and California Subclass Members' personal information, as defined by Civil Code section 1798.140(v)(1), was subject to unauthorized access and exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, medical record numbers, diagnoses, treatment locations, procedure types, treatment cost information, doctors' names, health insurance information and patient identification numbers.

207. Defendants maintained Plaintiff's and California Subclass Members' Private Information in a form that allowed criminals to access it.

208. The Data Breach occurred as a result of Defendants' failure to implement and maintain reasonable security procedures and practices for protecting the exposed information given its nature. Defendants failed to monitor their systems to identify suspicious activity and allowed unauthorized access to Plaintiff's and California Subclass Members' Private Information.

209. Consistent with Civil Code Section 1798.150(b), Plaintiff will provide written notice to Defendants identifying the CCPA provisions that Defendants violated.

210. On behalf of California Subclass Members, Plaintiff presently seeks actual pecuniary damages and injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA. Unless and until Defendants are

restrained by order of the Court, their wrongful conduct will continue to cause irreparable injury to Plaintiff and the California Subclass.

211. If Defendants fail to timely rectify or otherwise cure the CCPA violations described herein, individually and on behalf of the California Subclass, Plaintiff reserves his right to amend this Class Action Complaint to seek statutory damages and any other relief the Court deems proper as a result of Defendants' CCPA violations pursuant to Cal. Civ. Code § 1798.150(a).

**Count 9**
**Violation of the Confidentiality of Medical Information Act ("CMIA")**
**Cal. Civ. Code §§ 56 *et seq.***
**On behalf of Plaintiff and the California Subclass**

212. Plaintiff, individually and on behalf of the California Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

213. Defendants are providers of healthcare under Cal. Civ. Code § 56.06, subdivision (a), because they maintain medical information that is designed to maintain medical information for the purposes of allowing their users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

214. Under California's Confidentiality of Medical Information Act ("CMIA"), "persons receiving health care services have a right to expect that the confidentiality of individual identifiable medical information derived by health service providers be reasonably preserved . . . [and it] is the intention of the Legislature in enacting this act, to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information. Cal. Civ. Code Div. 1, Pt. 2.6.

215. Furthermore, "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores,

abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code § 56.101(a).

216. Defendants are therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that they maintain on behalf of users.

217. The CMIA defines medical information as meaning any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." The information Defendant maintained and disclosed is medical information because "medical record number, diagnosis, treatment location, procedure type, treatment cost information, doctor's name, health insurance information and patient identification number" provide information about a subscriber's medical history, and was individually identifiable because it included information, including the subscriber's name and date of birth, and other information which "alone or in combination with other publicly available information reveals the identity of the individual."

218. Defendants were negligent because they failed to take reasonable precautions to ensure their data systems were protected. As a result of Defendants' negligence, an unauthorized third party viewed and obtained the medical information of Plaintiff and the California Subclass.

219. Defendants violated Cal. Civ. Code Section 53.06(e) because they did not maintain the confidentiality of Plaintiff's and California Subclass Members' medical information. This identifiable information was shared with criminal actors and it is unclear how far downstream the information may have been shared.

220. This negligent disclosure is in violation of Cal. Civ. Code Section

56.06(e) Accordingly, Plaintiff and California Subclass Members are entitled to: (1) nominal damages of $1,000 per violation pursuant to Cal. Civ. Code Section 53.36(b); (2) actual damages, in an amount to be determined at trial; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

221. Plaintiff also seeks other such relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and his counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to adequately safeguard the PII and PHI of Plaintiff and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

F. That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate; and

H. All such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: May 6, 2026

Respectfully submitted,

*/s/ Amber L. Schubert*

Robert C. Schubert (SBN 62684)
Amber L. Schubert (SBN 278696)
Sonum Dixit (SBN 353395)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
rschubert@sjk.law
aschubert@sjk.law
sdixit@sjk.law

*Counsel for Plaintiff and the Proposed Class*